IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 1, 2021

**STACI L. ROBINSON v. ERIC S. ROBINSON**

**Appeal from the Chancery Court for Hawkins County
No. 2019-CH-118   Douglas T. Jenkins, Chancellor**

———————————————————

**No. E2020-01535-COA-R3-CV**

———————————————————

In this divorce action, the husband contends that the trial court erred by: (1) declining to award him alimony; (2) declining to adopt his valuation of the couple's three Subway franchises; (3) finding that he dissipated $65,000 from the marital estate; (4) awarding the wife a larger share of the marital estate; (5) imputing income of $58,000 to him for child support purposes; and (6) declining to award him his attorney's fees at trial. We affirm the trial court's rulings on all but one of these issues, finding that the evidence preponderates against the trial court's determination regarding the amount of marital assets the husband dissipated. We also deny the husband's request for attorney's fees on appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed
in Part, Modified in Part, and Remanded**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the court, in which JOHN W. MCCLARTY, and ARNOLD B. GOLDIN, JJ., joined.

Zachary T. Powers and Tyler S. Waterfield, Knoxville, Tennessee, for the appellant, Eric S. Robinson.

J. Matthew King, Kingsport, Tennessee, for the appellee, Staci L. Robinson.

**OPINION**

**FACTS AND PROCEDURAL HISTORY**

Eric S. Robinson ("Husband") and Staci L. Robinson ("Wife") were married in August 1990. Husband and Wife have two children together, only one of which was a minor at the time of trial. Husband, who is a college graduate and has a master's degree, was 51 years old at the time of trial. Wife, who attended college and underwent training to become a medical assistant, was 48 years old at the time of trial. During the first few years of the marriage, Husband was employed by the Department of Veteran's Affairs and made

$52,000 per year. From 1992 to 1999, Wife was employed by a hospital insurance department and made approximately $15–20,000 per year. During the past twenty years of their marriage, both spouses worked in the Subway restaurants Wife owned.

In 1999, Husband and Wife opened their first Subway franchise. According to Husband, the couple acquired the franchise using $85,000 of his personal savings, along with a $15,000 loan. In 2001, the couple sold the Subway franchise for a profit and acquired a new Subway franchise in Kingsport, Tennessee. Approximately three years later, Husband and Wife took out various loans to acquire an additional Subway franchise in Kingsport, Tennessee. Then, in 2018, Husband and Wife borrowed roughly $360,000 to open a third Subway franchise in Bristol, Tennessee.

All three Subway franchises listed Wife as the sole owner; however, Husband and Wife's testimonies conflicted as to why Wife was listed as the sole owner of the franchises. Wife testified that Husband chose to list her as the sole owner in an effort to avoid child support obligations to his children, born to other women prior to the marriage. Husband, however, testified that Wife was listed as the sole franchisee because the Subway franchise fee would have been twice the amount had both of them been listed as the franchisees.

In February 2019, prior to the couple's separation, Husband planned to open a smoothie shop, and between February 2019 and April 2019, Husband purchased equipment and inventory for this purpose. Wife testified that she was aware of the new venture roughly six months prior to their separation but that she had routinely voiced her opposition to the venture, believing it would be unsuccessful. At trial, Husband testified that he used his credit cards to finance the investment, which ultimately totaled $75,000; however, due to an inability to pay his credit card bills during the pendency of the divorce, the accrual of interest and penalties increased his credit card balance to approximately $90,000. Moreover, the planned smoothie shop never opened.

*The Divorce Proceedings*

Wife filed for divorce on May 7, 2019, seeking a divorce on irreconcilable differences as well as other grounds. Husband filed an answer and a counter-complaint in which he sought a legal separation instead of a divorce. After the issuance of an order restraining each party from unilaterally transferring or dissipating marital assets, the parties filed cross-motions for temporary orders that pertained to their personal and business finances, as well as the management of the Subway franchises. Additionally, Husband sought a temporary award of spousal support, while Wife sought a temporary award for child support.

Prior to and during the divorce proceedings, Husband made several withdrawals from the parties' various accounts and lines of credit, which prompted Wife to "cut off" Husband from their joint bank accounts and Subway accounts. Resultingly, Wife alleged

that Husband had dissipated the marital estate in the amount of $90,000. Husband countered, arguing that any marital funds used by him after the couple's separation were used to pay bills, pay legal fees, and pay some "minimal living expenses."

Husband and Wife also argued significantly over control of the three Subway franchises. In this regard, Husband and Wife agreed that operating various Subway franchises had been their primary source of income for over twenty years, and both Husband and Wife expressed concerns regarding their respective employment prospects should the Subway franchises be sold. Husband and Wife offered conflicting testimony, however, as to Husband's involvement in operating the Subway franchises. For her part, Wife claimed that Husband's involvement was virtually non-existent, while Husband argued that he actively participated in running the day-to-day operations of each franchise up until the couple's separation. An employee of one of the Subway locations testified that the franchises had been run by Wife for years and that Husband's involvement in the day-to-day operations of the franchises was significantly less than Wife's. The same employee also testified that various employees had complained about Husband's behavior toward employees and that these concerns were relayed to Wife.

Due to conflicts between the spouses, as well as Husband's conflicts with certain Subway employees, the court prohibited Husband from participating in the management of the Subway franchises. Because the trial court ordered that Husband not be involved in the Subway franchises during the pendency of the divorce, the court awarded Husband $2,500 per month as temporary spousal support. At the same time, however, the court directed Husband to begin searching for employment.

In preparation for trial, Wife retained a business valuation expert, Travis McMurray of Trinity Valuation Consulting Group, PLC, to perform valuations on the three Subway franchises. Mr. McMurray testified that he valued the three franchises as of November 30, 2019. At the time of the valuation, the 2019 tax return had not yet been completed. For this reason, Mr. McMurray primarily relied on the tax returns for 2016, 2017, and 2018—as well as industry data regarding food services, cost of goods sold, wages, rent, and utilities—to make his ultimate determination. Mr. McMurray testified that he also took into consideration the numbers from the incomplete 2019 tax return to project a net income of $58,000 for the three franchises that year. Ultimately, Mr. McMurray placed the combined value of the three Subway franchises at $343,100.

Husband did not hire a business valuation expert; however, Husband testified that he believed the three Subway franchises were worth $1,250,000. Husband stated that his valuation was based on his discussions with unidentified persons at Subway's corporate office. Husband also stated that he would be approved as a Subway franchise owner should the trial court award him one or more of the franchises.

Regrading debt associated with the three franchises, Wife testified that she had obtained two loans—one through the Small Business Administration ("SBA") in the amount of $150,000 and one through the Paycheck Protection Program ("PPP") in the amount of $80,000—to support the franchises in the wake of the COVID-19 pandemic. According to Wife, she would be able to pay off both loans within five years.

Regarding the rest of the marital estate, Wife testified that the appraised value of the marital residence was $497,000 and that two separate mortgages were associated with the residence in the amounts of $392,250 and $85,000. The other marital assets, which were modest, included two vehicles, a Chevrolet Tahoe and a Volkswagen Jetta.

In addition to the secured debts mentioned above, the spouses were individually and/or jointly indebted on numerous credit card accounts in various amounts, some of which had been closed and gone into collection. In sum, the aggregate marital debt was close to the value of the parties' marital assets.

As noted earlier, when the court awarded Husband temporary spousal support, it also directed Husband to begin searching for long-term employment. At trial, however, Husband testified that he had not made efforts to obtain immediate employment. Instead, Husband testified that he had begun the lengthy process of opening both a Subway franchise and the smoothie shop in Florida. When asked why he had not attempted to find other employment in the meantime, Husband indicated that he had been occupied with the divorce proceedings. Nevertheless, Husband testified that he had sufficient education and training to maintain a job, including managing the Subway franchises, and that he was both physically and mentally able to maintain a regular job.

With regard to his need for alimony, Husband testified that, prior to separation, the couple's monthly income was approximately $20,000 and that he would require at least $7,800 per month to maintain his standard of living. Husband testified that he would be unable to maintain this standard of living absent ongoing spousal support due to the debt that he had incurred throughout the divorce proceedings.

Regarding the couple's minor daughter, Wife filed a motion for temporary parenting plan that included temporary child support to be paid by Husband, which the court granted. Under the temporary plan, Husband was entitled to visitation with their minor children[1] every other weekend, should the minor children "decide to exercise it." In granting Wife's motion, the trial court also ordered that the children participate in family counseling with Husband if Husband "pays for it and schedules it."

---

[1] At the time Wife's Motion for Temporary Parenting Plan was granted, Husband and Wife shared two minor children, aged seventeen and fifteen; however, by the conclusion of trial, the oldest child had reached the age of majority.

*The Final Decree*

The trial concluded on July 21, 2020, and a post-trial hearing took place on August 28, 2020. At the hearing, the trial court declared the parties divorced without fault pursuant to Tennessee Code Annotated § 36-4-129(b) and went on to address the division of the marital estate. In doing so, the trial court found $25,000 of equity in the marital home and valued the three Subway franchises at $450,000. The trial court then awarded the marital residence to Wife but ordered Wife to pay Husband one-half of the home's $25,000 equity. The trial court also awarded Wife all three of the Subway franchises but ordered Wife to pay Husband one-half of the $450,000 business valuation. In addition, the court determined that Wife would retain possession of the Chevrolet Tahoe but that Husband would retain possession of his Volkswagen Jetta. According to Husband, the trial court also awarded him miscellaneous personal property valued at approximately $32,000.

Regarding the issue of dissipation, the trial court determined that Husband had dissipated the marital estate in the amount of $65,000. Because half of the dissipated amount was Husband's, the court held that Husband owed Wife $32,500. The trial court also determined, however, that Wife owed Husband $24,375 in unpaid temporary spousal support. Thus, the trial court credited the unpaid support against the dissipation amount and held that Husband owed Wife $8,125, which would be deducted from the overall distribution of marital assets. Ultimately, the court concluded that Wife owed Husband a total of $229,375. The court also held that Wife would pay Husband by making periodic monthly payments in the amount of $1,900 and that any balance remaining after six years would become due and payable at that time. The court imposed a 5.25% judgment interest on the amount. Finally, the trial court permitted Husband to retain a lien on the marital residence and on all business assets until Wife had paid him in full.

Regarding marital debt, the trial court assigned each party the following:

Wife

Mohela Student Loan ($37,000)
SBA Loans ($180,000)
PPP Loan ($82,500)
Debt to Wade McClellan ($56,052.56)
BBT Mortgage ($383,000)
Horne Trust HELOC ($85,000)
State Farm Credit Card ($4,000)
Home Trust Credit Card ($6,000)
US Bank Equipment Loan ($260,135.93)
Remaining Fee Owed to Mr. McMurray ($1,500)
Lowe's Credit Card ($12,161.03)

Husband

Comenity Bank ($20,907.50)
Discover Card ($31,031.06)
First National Bank ($7,168.54)
Regions Bank ($25,277.65)
Regions Bank ($11,918)
Regions Bank ($4,354.49)
Kohl's Credit Card ($1,336.00)
Amazon Credit Card ($2,083.95)
US Bank Credit Card ($11,904.28)
First Franklin ($1,518.95)
Regional Finance ($7,360.64)
Grand Home ($6,150.59)

**Total: $1,107,349.52**

Triple A Trailers ($9,305.50)
Carmax ($14,325.07)
Volkswagen Credit ($15,280)
Medical Bills ($164)
MRS Bro ($491.69)
Mohela Student Loan ($46,000)
Caesar's Credit Card ($19,567.06)

**Total: $236,144.97**

With regard to the parties' minor daughter, the court made Wife the primary residential parent, giving Husband 145 days of visitation each year. For child support purposes, the trial court found Husband to be willfully unemployed and imputed a $58,000 yearly income to Husband. Based on the Child Support Guidelines, Wife was ordered to pay Husband $75 per month in child support. Finally, the trial court declined to award Husband any alimony. The trial court concluded by denying the parties' competing motions for attorney's fees and motions for contempt.

This appeal followed.

## ISSUES

Husband raises several issues for our consideration:

I. Whether the trial court erred in failing to award Husband alimony of any amount, type, or duration?

II. Whether the trial court erred in the valuation and equitable division of the marital estate?

   a. Whether the trial court erred in relying upon the business valuation performed by Wife's expert witness, Mr. Travis McMurray?

   b. Whether the trial court erred in finding that Husband had dissipated the marital estate?

   c. Whether the trial court erred in awarding Wife a disproportionately greater share of the marital estate?

III. Whether the trial court erred in imputing additional income to Husband in the amount of $58,000 for child support purposes?

IV. Whether the trial court erred in failing to award Husband his attorney's fees at trial?

V. Whether Husband should be awarded his attorney's fees on appeal?

## STANDARD OF REVIEW

Because distinctly different standards of review pertain to the issues on appeal, we shall identify the standard that applies to each issue as it is discussed below.

## ANALYSIS

### I. The Marital Estate

Husband contends the trial court erred with regard to the classification, valuation, and division of the marital estate in numerous ways. Husband argues: (1) that the trial court should have given credit to him for his initial investment of $85,000 in the first Subway franchise, essentially arguing that it should have been classified as his separate property; (2) that the trial court inappropriately relied on the expert testimony of Mr. McMurray in valuing the three Subway franchises; (3) that the trial court incorrectly found that he dissipated $65,000 from the marital estate; and (4) that the trial court erred by awarding Wife a greater share of the marital estate. We will address each in turn.

### A. Husband's Initial Investment of $85,000 in the First Subway Franchise

Husband argues that the trial court should have given credit to him for his initial investment of $85,000 in the first Subway franchise because his $85,000 investment came from a $50,000 inheritance from his father and $35,000 of back pay owed to Husband by the Department of Veteran's Affairs. Based on these facts, Husband argues that this investment should be classified as his separate property. We respectfully disagree.

As this court has explained:

Tennessee is a "dual property" jurisdiction because its divorce statutes draw a distinction between marital and separate property, requiring that marital property be equitably divided; consequently, proper classification of a couple's property is essential. Division of the estate begins with the identification of all property interests followed by classification of property as either marital or separate. Property cannot be included in the marital estate unless it fits within the statutory definition of "marital property," and by the same token, "separate property," as defined by statute, should not be included in the marital estate for division.

*Nesbitt v. Nesbitt*, No. M2006-02645-COA-R3-CV, 2009 WL 112538, at *6 (Tenn. Ct. App. Jan. 14, 2009) (citations omitted).

Marital property is defined as "all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce." Tenn. Code Ann. § 36-4-121(1)(A). Conversely, separate property is statutorily defined as, *inter alia*: "[a]ll real and personal property owned by a spouse before marriage"; "[p]roperty acquired by a spouse at any time by gift, bequest, devise or descent"; and "[p]ain and suffering awards, victim of crime compensation awards, future medical expenses, and future lost wages." Tenn. Code Ann. § 36-4-121(b)(2)(A), (D), and (E).

However, separate property may be transmuted into marital property "when separate property is treated in such a way as to give evidence of an intention that it become marital property. . . . The rationale underlying [this] doctrine is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate." *Snodgrass v. Snodgrass*, 295 S.W.3d 240, 256 (Tenn. 2009) (quoting *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002)).

Questions concerning "the classification of property as either marital or separate, as opposed to questions involving the appropriateness of the division of the marital estate, are inherently factual." *Owens v. Owens*, 241 S.W.3d 478, 485 (Tenn. Ct. App. 2007) (citations omitted). Thus, a trial court's decision will not be disturbed unless the evidence preponderates to the contrary. *Woodward v. Woodward*, 240 S.W.3d 825, 828 (Tenn. Ct. App. 2007) (citations omitted).

It is undisputed that the $85,000 in question was remitted to Subway for the purpose of acquiring a franchise with Wife being designated as the sole franchisee. It is also undisputed that this investment was made with the intent that Husband and Wife would operate the franchise jointly, which they did for twenty years. Based on these undisputed facts, it is readily apparent that Husband intended the initial investment to be a gift to the marital estate. Therefore, the evidence does not preponderate against the trial court's finding that the $85,000 investment in the first Subway franchise was marital property.

B. The Subway Franchises

Husband contends that the trial court erred in its valuation of the three Subway franchises by inappropriately relying on the testimony of Wife's expert, Travis McMurray. In making this argument, Husband asserts that the trial court should not have considered Mr. McMurray's testimony in valuating the franchises because of its "speculative nature." Husband contends that the testimony was speculative because, in making his opinion, Mr. McMurray utilized "incomplete sales tax numbers for 2019 and the industry data for the

majority of business-related expenses." More specifically, Husband emphasizes that Mr. McMurray's projected net income for the franchises was approximately $60,000 less than the actual net income for the franchises once the 2019 tax return was completed. We respectfully disagree.

Once a trial court has classified property as either marital or separate property, "it should place a reasonable value on each piece of property subject to division." *Owens*, 241 S.W.3d at 486 (citing *Davidson v. Davidson*, No. M2003-01839-COA-R3-CV, 2005 WL 2860270, at *2 (Tenn. Ct. App. Oct. 31, 2005); *Edmisten v. Edmisten*, No. M2001-00081-COA-R3-CV, 2003 WL 21077990, at *11 (Tenn. Ct. App. May 13, 2003)). To allow for this determination, both parties must provide competent valuation evidence. *Kinard v. Kinard*, 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998) (citation omitted). "When valuation evidence is conflicting, the court may place a value on the property that is within the range of the values represented by all the relevant valuation evidence." *Owens*, 241 S.W.3d at 486 (citation omitted). "On appeal, we presume the trial judge's factual determinations are correct unless the evidence preponderates against them." *Kinard*, 986 S.W.2d at 231 (Tenn. Ct. App. 1998) (citing *Jahn v. Jahn*, 932 S.W.2d 939, 941 (Tenn. Ct. App. 1996)).

After reviewing Mr. McMurray's curriculum vitae, the trial court determined that Mr. McMurray was competent to testify as an expert in business valuation. At trial, Mr. McMurray testified that the combined value of the Subway franchises was $343,100. In stark contrast, Husband testified that he believed the combined value of the Subway franchises to be roughly $1,250,000. Ultimately, the trial court declined to strictly adhere to either party's valuation and valued the three Subway franchises at $450,000, a value substantially greater than that set by Mr. McMurray and substantially less than that set by Husband.

Husband contends that Mr. McMurray's testimony was flawed because Mr. McMurray did not consider the franchise's finalized 2019 tax return documents or use information specific to the subject franchises to project expenses when he conducted the valuation. We note, however, that both of these considerations were brought to the attention of the trial court by Husband, and it is apparent that the trial court considered such because the court valued the Subway franchises at an amount that was nearly $110,000 more than Mr. McMurray's expert valuation.

As noted above, the parties must provide competent valuation evidence, *see Kinard*, 986 S.W.2d at 231, and "[w]hen valuation evidence is conflicting, the court may place a value on the property that is within the range of the values represented by all the relevant valuation evidence," *Owens*, 241 S.W.3d at 486. The court did just that in this case, and, "[o]n appeal, we presume the trial judge's factual determinations are correct unless the evidence preponderates against them." *Kinard*, 986 S.W.2d at 231 (citation omitted). Having determined that the evidence does not preponderate against the value assigned by

the trial court, which was within the range of values presented to the court, *see Owens*, 241 S.W.3d at 486, we affirm the trial court's valuation of the Subway franchises.

## C. Dissipation of the Marital Estate

Husband challenges the distribution of the marital estate on multiple grounds. For one, he contends the trial court erred when it determined that he dissipated the marital estate in the amount of $65,000, although Husband concedes that the evidence contained in the record is sufficient to support a finding that he dissipated approximately $39,000.

In its final decree, the trial court stated, in pertinent part: "[t]he Court also finds that Defendant dissipated the marital estate by sixty-five thousand dollars ($65,000.00) half of which was his, so he owes Plaintiff thirty-two thousand five hundred dollars ($32,500.00)." Significantly, this ruling was not supported by specific findings of fact.

In cases tried without a jury, Tennessee Rule of Civil Procedure 52.01 requires the trial court to make findings of fact **and** conclusions of law:

> In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein.

Tenn. R. Civ. P. 52.01.

The underlying rationale for Rule 52.01's mandate is that written findings of fact and conclusions of law facilitate appellate review by "affording a reviewing court a clear understanding of the basis of a trial court's decision." *In re Est. of Oakley*, No. M2014-00341-COA-R3-CV, 2015 WL 572747, at *10 (Tenn. Ct. App. Feb. 10, 2015) (quoting *Lovlace v. Copley*, 418 S.W.3d 1, 34 (Tenn. 2013)). "In the absence of written findings of fact and conclusions of law, this court is left to wonder on what basis the court reached its ultimate decision." *Id.* (quoting *In re Christian G.*, No. W2013-02269-COA-R3-JV, 2014 WL 3896003, at *2 (Tenn. Ct. App. Aug. 11, 2014)). Further, compliance with the mandate of Rule 52.01 enhances "the authority of the trial court's decision by providing an explanation of the court's reasoning." *Gooding v. Gooding*, 477 S.W.3d 774, 782 (Tenn. Ct. App. 2015) (quoting *In re Zaylen R.*, No. M2003-00367-COA-R3-JV, 2005 WL 2384703, at *2 (Tenn. Ct. App. Sept. 27, 2005)).

"There is no bright-line test by which to assess the sufficiency of the trial court's factual findings . . . ." *Lovlace*, 418 S.W.3d at 35. The general rule is that "the findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing

court the steps by which the trial court reached its ultimate conclusion on each factual issue." *Id.* (quoting 9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2579 (3d ed. 2005)).

If the trial court makes the required findings of fact, the trial court's factual findings are reviewed de novo, accompanied by a presumption of the correctness of the finding of fact, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Boarman v. Jaynes*, 109 S.W.3d 286, 290 (Tenn. 2003) (quoting *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001)). "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999).

"When the trial court fails to explain the factual basis for its decisions, we may conduct a de novo review of the record to determine where the preponderance of the evidence lies or remand the case with instructions to make the requisite findings of fact and conclusions of law and enter judgment accordingly." *Gooding*, 477 S.W.3d at 783 (citations omitted). The trial court's conclusion that Husband dissipated the marital estate was not supported by specific findings of fact. Therefore, in the interest of judicial economy, "we shall conduct our own de novo review to first determine where the preponderance of the evidence lies and then determine whether the evidence, when applied to the applicable legal principles, provides a proper factual foundation for the decision challenged on appeal." *Id.*

Based on our assessment of both the appellate record and Wife's appellate brief, we have determined that Wife alleged that the following transactions constituted dissipation of the marital estate: (1) Husband took $8,000 in cash from one of the Subway franchise's store safe; (2) Husband withdrew $10,000 from the couple's joint Regions Bank account; (3) Husband withdrew $4,900 from a Regions Bank account set up to manage Subway business transactions; (4) Husband borrowed $13,000 from a joint Regions Bank personal line of credit; (5) Husband payed a total of $5,000 toward his personal Discover credit cards from a joint Regions Bank checking account; (6) Husband wrote a check to himself in the amount of $2,900 from a joint Regions Bank checking account on May 2, 2019; (7) Husband withdrew all funds, totaling $2,950, from the children's savings accounts; (8) Husband demanded and received a refund check in the amount of $2,800 from a contractor for work on one Subway franchise's ventilation system, which Wife later had to repay; (9) Husband "stole" three royalty checks payable to the Subway franchises in the amounts of $5,862.24, $10,939.32, and $14,562.38; and (10) Husband withdrew an additional $2,900 from a joint Regions Bank checking account to purchase a car for his sister on April 29, 2019, which Wife did not approve of. Thus, Wife alleged that Husband dissipated approximately $85,000.

Regarding Husband's use of these funds, Wife testified that Husband took and completely paid for "two or three" trips to Florida for himself and "a bunch of people."

Further, Wife testified that Husband inappropriately used these marital funds to move to Destin, Florida, with his girlfriend and open the smoothie shop. According to Wife, she had vehemently opposed opening the smoothie shop prior to her filing for divorce, and she indicated to Husband that she did not believe the shop would be "a viable venture in the local area." Finally, Wife testified that she was unaware that Husband had a Discover card, and it was uncommon for them to pay off a credit card each month.

For his part, Husband denied that any of the transactions alleged to be dissipation were used for the purposes alleged by Wife. Instead, Husband admitted that he used the $4,900 withdrawal from the joint Regions Bank account and the $5,862.24 royalty check to pay his legal fees. Husband also admitted to spending money opening the smoothie shop and purchasing equipment, but he insisted that he did so by incurring a large amount of debt on his personal credit cards, not through inappropriate use of marital funds. Finally, Husband testified that every other transaction was used for his living expenses and to pay off various marital debts. Husband, however, admitted to taking various trips to Florida during the pendency of the divorce proceedings.

We have explained the concept of dissipation and the related burdens of proof as follows:

> Among the factors that courts may consider when fashioning an equitable division of a marital estate is a party's dissipation of the marital or separate property. Even though no statutory definition of "dissipation" exists, the term has a common meaning in the context of divorce. The concept of dissipation is based on waste. Dissipation of marital property occurs when one spouse uses marital property, frivolously and without justification, for a purpose unrelated to the marriage and at a time when the marriage is breaking down. Dissipation involves intentional or purposeful conduct that has the effect of reducing the funds available for equitable distribution.
>
> Whether a particular course of conduct constitutes a dissipation depends on the particular facts of the case. The party claiming that dissipation has occurred has the burden of persuasion and the initial burden of production. After the party alleging dissipation establishes a prima facie case that marital funds have been dissipated, the burden shifts to the party who spent the money to present evidence sufficient to show that the challenged expenditures were appropriate.

*Altman v. Altman*, 181 S.W.3d 676, 681–82 (Tenn. Ct. App. 2005) (citations omitted).

As noted above, "[t]he spouse alleging dissipation has the burden of persuasion and the initial burden of production to show that the other spouse engaged in 'intentional, purposeful, wasteful conduct.'" *Trezevant v. Trezevant*, 568 S.W.3d 595, 618 (Tenn. Ct.

- 12 -

App. 2018) (quoting *Berg v. Berg*, No. M2013-00211-COA-R3-CV, 2014 WL 2931954, at \*18 (Tenn. Ct. App. June 25, 2014)). Moreover, that burden includes distinguishing "between 'dissipation and discretionary spending.'" *Burden v. Burden*, 250 S.W.3d 899, 919–20 (Tenn. Ct. App. 2007) (quoting *Wiltse v. Wiltse*, No. W2002-03132-COA-R3-CV, 2004 WL 1908803, at \*4 (Tenn. Ct. App. Aug. 24, 2004)). After careful review of the record, we have determined that Wife failed to carry her burden of proof to establish that Husband dissipated assets in excess of the $39,044.72 that Husband admits Wife provided sufficient testimony to prove.

Accordingly, we modify the trial court's ruling and remand with instructions for the trial court to enter judgment indicating that Husband dissipated the marital estate in the amount of $39,044.72, not $65,000.[2]

## D. Equitable Division of the Marital Estate

Finally, Husband argues that the trial court erred by giving Wife a disproportionate share of the marital estate. We respectfully disagree.

Once the marital property has been classified and valued, the trial court is to divide the marital property in an equitable manner. *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001) (citation omitted); *see* Tenn. Code Ann. § 36-4-121(a)(1). "Dividing a marital estate is not a mechanical process . . . ." *Kinard*, 986 S.W.2d at 230. Rather, the trial court must weigh the most relevant factors in light of the specific facts of the particular case. *Tate v. Tate*, 138 S.W.3d 872, 875 (Tenn. Ct. App. 2003) (citation omitted). For this reason, "[t]rial courts have wide latitude in fashioning an equitable division of marital property," *Brown v. Brown*, 913 S.W.2d 163, 168 (Tenn. Ct. App. 1994) (citing *Fisher v. Fisher*, 648 S.W.2d 244, 246 (Tenn. 1983)), and this court accords great weight to the trial court's decision, *Wilson v. Moore*, 929 S.W.2d 367, 372 (Tenn. Ct. App. 1996) (citing *Edwards v. Edwards*, 501 S.W.2d 283, 288 (Tenn. Ct. App. 1973)). Accordingly, we defer to the trial court's division of the marital estate unless it is inconsistent with the factors in Tennessee Code Annotated § 36-4-121 or is not supported by a preponderance of the evidence.[3] *Brown*, 913 S.W.2d at 168 (citation omitted).

---

[2] This modification will also necessitate a modification of the off-sets set forth in the trial court's final order.

[3] Tennessee Code Annotated § 36-4-121(c) provides, in pertinent part:

(c) In making equitable division of marital property, the court shall consider all relevant factors including:

(1) The duration of the marriage;

We begin our review by noting that, in dividing the marital estate, the trial judge stated that he had considered "T.C.A. § 36-4-121 and the applicable factors set therein."

Husband's principal argument concerning this issue is that he should have been given a larger share of the marital estate in light of the marital debt assigned to him. In this regard, we note that the trial court only awarded Husband approximately 29% of the marital estate and awarded Wife approximately 72% of the marital estate. Significantly, however, at the time of divorce, the couple's debt exceeded their assets by approximately $300,000. Even more importantly, the trial court assigned approximately 82% of the couple's marital debt to Wife while assigning only approximately 18% to Husband. This is significant because this court has recognized that "the real issue is whether the trial court equitably divided the *net* assets of the parties, *i.e.*, marital assets less marital debts." *Robertson v. Robertson*, No. 03A01-9711-CV-00511, 1998 WL 783339, at *2 (Tenn. Ct. App. Nov. 9, 1998). Additionally, and as previously recognized, marital assets and debts "need not be

<hr>

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

divided equally, but equitably in light of the **total division** of property." *Elbell v. Elbell*, No. E2003-03017-COA-R3-CV, 2004 WL 2159021, at *4 (Tenn. Ct. App. Sep. 27, 2004) (emphasis added). Thus, given our standard of review, we cannot say that the trial court erred in dividing the marital estate.

## II. Husband's Income for Child Support Purposes

Husband argues that the trial court erred by imputing income to him for purposes of setting child support.[4] In making this argument, Husband contends that it was inappropriate to impute $58,000 of income to him because the trial court did not first find that Husband was voluntarily unemployed or underemployed. We, however, have determined that it is implicit in the trial court's final order that it found Husband was voluntarily unemployed and that the evidence contained in the record does not preponderate against this finding.

"Willful and voluntary underemployment can impact the amount of child support and alimony to be paid." *Stockman v. Stockman*, No. M2009-00552-COA-R3-CV, 2010 WL 623724, at *2 (Tenn. Ct. App. Feb. 22, 2010) (quoting *Lightfoot v. Lightfoot*, No. E2001-106-COA-R3-CV, 2001 WL 1173297, at *6 (Tenn. Ct. App. Oct. 4, 2001)). "Whether a party is willfully and voluntarily underemployed [or unemployed] is a fact question, and the trial court has considerable discretion in its determination." *Willis v. Willis*, 62 S.W.3d 735, 738 (Tenn. Ct. App. 2001) (citation omitted). Thus, this court will "accord the trial court's findings of underemployment 'a presumption of correctness, unless the preponderance of the evidence is otherwise.'" *Stockman*, 2010 WL 623724, at *2 (quoting *Richardson v. Spanos*, 189 S.W.3d 720, 737–38 (Tenn. Ct. App. 2005)) (citing Tenn. R. App. P. 13(d)).

When considering whether a parent is voluntarily unemployed or underemployed, the Child Support Guidelines provide the following guidance:

> The Guidelines do not presume that any parent is willfully underemployed or unemployed. The purpose of the determination is to ascertain the reasons for the parent's occupational choices, to assess the reasonableness of these choices in light of the parent's obligation to support his or her child(ren), and to determine whether such choices benefit the children.
>
> .    .    .
>
> . . . The determination may be based on any intentional choice or act that adversely affects a parent's income.

Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii), (I).

---

[4] Husband does not challenge the amount of income established for Wife.

In making this determination, a trial court "must consider the party's past and present employment and whether the party's choice to accept a lower paying job was reasonable and made in good faith." *Stockman*, 2010 WL 623724, at *2 (quoting *Willis*, 62 S.W.3d at 738)) (citing Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii)–(iii)). Significantly, when a parent testifies that he has the ability to earn a higher income, this court has routinely determined that such a statement constitutes evidence of willful unemployment or underemployment. *See, e.g.*, *Willis*, 62 S.W.3d at 738 (Tenn. Ct. App. 2001) (citing *Anderson v. Anderson*, No. 01A01-9704-CH-00186, 1998 WL 44947, at *4 (Tenn. Ct. App. Feb. 6, 1998); *Riley v. Riley*, No. 03A01-9480-CH-000268, 1995 WL 311331, at *1 (Tenn. Ct. App. May 22, 1995); *Gutknecht v. Gutknecht*, No. 01A01-9101-CH-00015, 1991 WL 79560, at *1 (Tenn. Ct. App. May 17, 1991)).

As a threshold matter, we recognize that both Husband and Wife agreed their sole source of income for the last twenty years was the three Subway franchises. However, throughout the pendency of the divorce proceedings, Husband was not permitted to participate in the management of the Subway franchises or work for the franchises. On the contrary, the trial court specifically ordered Husband to seek employment elsewhere. The trial court's directive notwithstanding, Husband testified at trial that he had not looked for other employment even though he had the ability to earn more than his monthly disability check, which was the sole source of his income throughout the trial court proceedings. Furthermore, Husband testified that he had both a bachelor's degree and a master's degree and the physical and mental ability to find employment. In addition to his testimony regarding his general education and ability to work, Husband testified that he had the specific ability, education, and training to work as a Subway manager and that he would be approved for a Subway franchise if he applied.

When asked why he did not attempt to find employment in the months leading up to the trial, the only explanation that Husband could give was that he was going through the divorce. Moreover, while Husband testified that he chose to begin the lengthy process of opening both a new Subway franchise and a smoothie shop, Husband also testified that neither ultimately resulted in any income to him and, to the contrary, resulted in a significant amount of debt. Finally, after admitting that his attempts to open various franchises were unsuccessful, Husband also admitted that he had not made any meaningful effort to find subsequent employment. For these reasons, we find the evidence does not preponderate against the trial court's finding that Husband was voluntarily unemployed.

Furthermore, we find that the amount imputed to Husband was appropriate. After determining that Husband was willfully unemployed, the trial court determined that the amount of imputed income should be $58,000 per year because "that's what the expert testified to for these managers of these sandwich shops and little restaurants." As previously discussed, Husband testified that he had the ability, education, and training to manage a Subway, and Husband stressed that he had, in fact, been working to manage the couple's own Subway franchises for more than twenty years. Thus, based on Husband's

testimony, combined with the testimony of Mr. McMurray, the evidence does not preponderate against the trial court's imputation of $58,000 of income to Husband. Accordingly, we affirm the trial court on this issue.

## III. Alimony

Husband contends the trial court erred by declining to award him spousal support of any type or duration. Husband contends that this decision was inappropriate in light of the duration of the marriage and the amount of marital debt assigned to him. We respectfully disagree.

Our Supreme Court has discussed the standard of review applicable to the trial court's decision regarding alimony in great detail:

> For well over a century, Tennessee law has recognized that trial courts should be accorded wide discretion in determining matters of spousal support. This well-established principle still holds true today, with this Court repeatedly and recently observing that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award.
>
> Equally well-established is the proposition that a trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision.

*Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105–106 (Tenn. 2011) (footnote omitted) (citations omitted) (first quoting *Kinard*, 986 S.W.2d at 234; then quoting *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006); and then quoting *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010)).

Tennessee recognizes four types of spousal support: (1) rehabilitative alimony; (2) transitional alimony; (3) alimony in solido; and (4) alimony in futuro. *Mayfield v. Mayfield*, 395 S.W.3d 108, 115 (Tenn. 2012). Both transitional and rehabilitative alimony are forms of short-term support. *See id.*

"[R]ehabilitative alimony is intended to assist an economically disadvantaged spouse in acquiring additional education or training which will enable the spouse to achieve a standard of living comparable to the standard of living that existed during the marriage or the post-divorce standard of living expected to be available to the other spouse." *Gonsewski*, 350 S.W.3d at 108. The fundamental purpose of alimony is to "eliminat[e] spousal dependency where possible." *Id.* at 110. When determining whether to award alimony and "the nature, amount, length, and manner of payment," courts are required to consider the factors set forth in Tennessee Code Annotated § 36-5-121(i). *Id.* at 109–10.

In contrast, transitional alimony is appropriate when a court finds that rehabilitation is not required. *Mayfield*, 395 S.W.3d at 115. It "is designed to aid a spouse who already possesses the capacity for self-sufficiency but needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income." *Gonsewski*, 350 S.W.3d at 109. "Transitional alimony is payable for a definite period of time and may be modified only if: (1) the parties agree that it may be modified; (2) the court provides for modification in the divorce decree . . . ; or (3) the recipient spouse resides with a third person following the divorce." *Mayfield*, 395 S.W.3d at 108; *accord* Tenn. Code Ann. § 36-5-121(g)(2).

Alimony in solido and alimony in futuro are both forms of long-term support. *Mayfield*, 395 S.W.3d at 115. Alimony in solido is "typically awarded to adjust the distribution of the marital estate." *Id.* It is not modifiable and does not terminate upon the death or remarriage of the recipient. *Id.*

Alimony in futuro is intended to provide long-term support "until the death or remarriage of the recipient." *Gonsewski*, 350 S.W.3d at 107. It is appropriate when a court finds that there is relative economic disadvantage and rehabilitation is not feasible. Tenn. Code Ann. § 36-5-121(f)(1). This situation exists when

> the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during

the marriage, or to the post-divorce standard of living expected to be available to the other spouse.

*Id.* Alimony in futuro is not a guarantee that the recipient will "be able to enjoy a lifestyle equal to that of the obligor spouse." *Gonsewski*, 350 S.W.3d at 108 (quoting *Riggs v. Riggs*, 250 S.W.3d 453, 456 n.2 (Tenn. Ct. App. 2007)). "In many instances, the parties' assets and incomes simply will not permit them to achieve the same standard of living after the divorce as they enjoyed during the marriage." *Id.* "[A]lthough the court must consider each of the relevant statutory factors relevant to the parties' circumstances, 'the two that are considered the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay.'" *Holdsworth v. Holdsworth*, No. W2013-01948-COA-R3-CV, 2015 WL 3488929, at *25 (Tenn. Ct. App. June 3, 2015) (quoting *Gonsewski*, 350 S.W.3d at 110). Now guided by these principles, we will turn to whether the trial court's decision not to award Husband spousal support "of any type" was in error in light of the specific circumstances of this case.

Here, Husband argues that the trial court inappropriately declined to award alimony by failing to consider the duration of the marriage and the amount of marital debt already assigned to him. The trial court's final order, however, makes clear that it denied Husband's request for alimony after the court determined that Husband did not have a need for alimony in light of the cash assets already awarded to him. In making its ruling, the trial court explained that it was denying Husband's request for alimony because it had already awarded Husband "quite a few cash assets." Indeed, specifically with regard to cash assets, the trial court ordered Wife to pay Husband (1) a total of $225,000 for his one-half interest in the three Subway franchises, (2) a total of $12,500 for his one-half interest in the marital home's equity, and (3) a total of $24,375 for failing to pay the ordered temporary spousal support to Husband during the pendency of the proceedings. After considering other amounts owed by Husband to Wife, the record shows that the trial court ultimately ordered Wife to pay Husband $229,375, amortized monthly for a ten-year period and subject to a 5.25% judgment rate.

Moreover, the trial court's determination is consistent with the other factors contained in Tennessee Code Annotated § 36-5-121(i).[5] Husband testified that he presently

---

[5] Tennessee Code Annotated § 36-5-121(i) states:

(i) In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

(1)    The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

has the ability to work managing a Subway franchise. *See id.* § 36-5-121(i)(1). While Wife attended four years of college and trained as a medical assistant, Husband earned a bachelor's degree in business and went on to obtain a master's degree in vocational rehabilitation. *See id.* § 36-5-121(i)(2). Husband testified that he did not have any mental health issue that would limit his ability to work. *See id.* § 36-5-121(i)(4). Husband testified that he was in good physical health. *See id.* § 36-5-121(i)(5). While the couple does have one minor child, the now 17-year-old child lives primarily with Wife. *See id.* § 36-5-121(i)(6). With regard to the distribution of the marital estate, Husband argues on appeal that he is entitled to spousal support "in light of the marital debt assigned to him." Significantly, however, the trial court assigned Wife nearly four times more marital debt than Husband. *See id.* § 36-5-121(i)(8). In addition, both Wife and an employee of the couple's Subway franchises testified that Husband had not played a meaningful role in the management of the Subway franchises for several years. *See id.* § 36-5-121(i)(10).

---

(2)  The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3)  The duration of the marriage;

(4)  The age and mental condition of each party;

(5)  The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6)  The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7)  The separate assets of each party, both real and personal, tangible and intangible;

(8)  The provisions made with regard to the marital property, as defined in § 36-4-121;

(9)  The standard of living of the parties established during the marriage;

(10)  The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11)  The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12)  Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Moreover, Wife testified that Husband did not contribute to maintaining the marital home and would often leave the home for days at a time. *See id.* Furthermore, while the trial court granted the divorce without fault, the trial court noted, "maybe in the quantum of fault, his is greater." *See id.* § 36-5-121(11).

Finally, we recognize that "the prior concept of alimony as lifelong support to enable the disadvantaged spouse to maintain the marital standard of living has been superseded by the statutory preference for short-term support." *Holdsworth*, 2015 WL 3488929, at *27 (citation omitted). In this regard, we find that the preponderance of the evidence supports the finding that Husband also does not have a need for either rehabilitative or transitional alimony. In fact, the record contains no evidence that he does.

As previously noted, Husband holds both a bachelor's degree and a master's degree; Husband agreed with Wife's counsel that "nothing limit[ed] [his] ability to work"; and Husband testified that he did not have any condition, physical or mental, that would limit his ability to work. With specific regard to transitional alimony, and as the trial court stated, Husband was awarded "significant cash assets" in the divorce, and, significantly, Wife had been ordered to pay Husband temporary spousal support throughout the pendency of these proceedings to assist him in transitioning to life outside of the marital home. For these reasons, the trial court did not abuse its discretion when it declined to award Husband alimony of any type or duration.

IV. Husband's Attorney's Fees at Trial

Husband argues that the trial court erred in failing to award him his attorney's fees at trial. "It is well-settled that an award of attorney's fees in a divorce case constitutes alimony in solido." *Gonsewski*, 350 S.W.3d at 113. Thus, in deciding whether an award of attorney's fees is appropriate, courts must consider the spousal support factors outlined in Tennessee Code Annotated § 36-5-121(i). As previously mentioned, the trial court determined that Husband did not have a need for spousal support in light of the amount of cash assigned to him as well as his ability to obtain gainful employment, and the evidence does not preponderate against this finding. Moreover, we have determined that the trial court's decision regarding alimony was not error. For this same reason, the trial court did not err when it declined to award Husband the attorney's fees he incurred in the trial court proceedings. Accordingly, we affirm.

V. Husband's Attorney's Fees on Appeal

Finally, Husband requests attorney's fees on appeal. Whether to award attorney's fees on appeal is a matter within the sole discretion of this court. *Shofner v. Shofner*, 181 S.W.3d 703, 719 (Tenn. Ct. App. 2004). "In determining whether an award for attorney's fees is warranted, we consider, *inter alia*, the ability of the requesting party to pay his or her own attorney's fees, that party's success on appeal, whether that party has acted in good

faith, and whether an award of attorney's fees is equitable." *Pack v. Pack*, No. M2018-00491-COA-R3-CV, 2019 WL 1934818, at *11 (Tenn. Ct. App. Apr. 30, 2019) (citation omitted). After consideration of each of these factors, we decline to award Husband the attorney's fees he incurred in this appeal.

### IN CONCLUSION

The judgment of the trial court is affirmed in part and modified in part, and this matter is remanded for further proceedings consistent with this opinion. Costs of appeal are assessed against Eric S. Robinson.

_____
FRANK G. CLEMENT JR., P.J., M.S.